**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHEN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JEFFREY L. WRIGHT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **NO. 1:14-CV-08163** |
| **vs.** | ) | |
| | ) | **Honorable Michael T. Mason** |
| **NANCY A. BERRYHILL, Acting** | ) | |
| **Commissioner of Social Security[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Claimant Jeffrey L. Wright ("Claimant") brings this motion for summary judgment [12] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Claimant's claim for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under §§§ 416(i), 423(d) and 1614(a)(3)(A) of the Social Security Act (the "SSA"). The Commissioner filed a cross-motion for summary judgment [22], asking that this Court uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons set forth below, the Claimant's motion for summary judgment is granted and the Commissioner's cross-motion is denied.

---

[1] Nancy A. Berryhill is substituted for her predecessor, Carolyn W. Colvin, pursuant to Federal Rule of Civil Procedure 25(d).

# I.    BACKGROUND

## A.  Procedural History

Claimant filed applications for DIB and SSI on August 4, 2011, alleging an onset date of December 21, 2010.  (R. 135, 137.)  Both the DIB and SSI claims were denied initially on November 10, 2011, and upon reconsideration on March 9, 2012.  (R. 143, 151.)  Claimant filed a written request for a hearing on March 13, 2012 pursuant to 20 C.F.R. § 404.929 *et seq.*  (R. 156-57.)  Claimant appeared and testified at a hearing held on August 8, 2012 before an ALJ.  (R. 92-133.)

After the initial hearing, the ALJ allowed Claimant's attorney to supplement the record with additional information.  (R. 133.)  After the supplemental information was provided, the ALJ requested another hearing on September 21, 2012.  (R. 84.)  Claimant did not appear or testify at this hearing because he was in the hospital.  (R. 86.)  The ALJ heard supplemental testimony from the impartial medical expert ("ME") and continued the hearing.  (R. 90.)  On February 8, 2013, Claimant appeared for his continued hearing along with his attorney and testified.  (R. 49-83.)  A Vocational Expert ("VE") and ME were also present to offer testimony.  (*Id.*)  On June 28, 2013, the ALJ issued a written determination finding Claimant not disabled and denying his DIB application.  (R. 19.)  Thereafter, Claimant requested review by the Appeals Council.  (R. 16.)  The Appeals Council denied the request for review on August 18, 2014.  (R. 1-3.)  The ALJ's April 25, 2013 decision became the final decision of the Commissioner.  20 C.F.R. § 416.1481; *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001).  Subsequently, Claimant filed this action in the District Court.

**B. Medical Evidence**

**1. Treating Physicians**

Claimant had a history of coronary heart disease and, in 2009, had a stent placed in the left anterior descending artery. [2] (R. 384.) On May 9, 2010, Claimant presented to LaGrange Memorial Hospital with atypical chest pain. (R. 477.) He had negative cardiac enzymes, a negative EKG, and an abnormal dobutamine stress echo. (*Id.*) Upon discharge "compliance with all meds and smoking cessation were stressed." (*Id.*) On October 25, 2010, Claimant had a cardiac catheterization, which showed a patent stent and nonobstructive coronary artery disease. (R. 384-85.) On November 18, 2010, Claimant presented to LaGrange Hospital with left arm pain, where he was treated and discharged two days later. (R. 670-71.)

On December 20, 2010, Claimant was admitted to the LaGrange Memorial Hospital for on-going chest pressure and shortness of breath. (R. 384.) Doctors conducted another catheterization because of Claimant's "history and progression of symptoms." (R. 384.) The catheterization showed nonobstructive coronary artery disease. (*Id.*) Claimant's blood pressure was also reported to have risen significantly. (*Id.*) It was noted that Claimant had chronic kidney disease and a history of diverticulosis. (*Id.*) He was released on December 21, 2010, and, again, instructed to stop smoking. (R. 385, 393.)

Claimant returned to the emergency room the following day. (R. 415.) He presented with pain in the right middle thigh. (R. 416.) A CT scan showed iliopsoas muscle hematoma, and an ultrasound showed evidence of a pseudoaneurysm in the right common femoral artery. (R. 414, 425.) Claimant underwent a thrombin injection

_____

[2] Most records prior to December 2010 have been omitted from the medical evidence summary.

and a profunda femoris repair.[3]  (R. 414.)  He was discharged on December 24, 2010, and his physicians requested he follow up in 10 days with Drs. Walsh and Lambert and Dr. Ansari, his primary care physician, as needed.  (*Id.*)

Claimant returned to the emergency room on December 28, 2010 alleging right thigh pain and possible wound infection from the thrombin injection.  (R. 458-59.)  He was treated for an iliopsoas hematoma on the right with cellulitis, and was discharged three days later with instructions to continue medication.  (R. 456-57.)

On January 4, 2011, Claimant went to his vascular surgeon and complained of pain and swelling near the wound area.  (R. 546.)  He was admitted to the hospital and was treated for the infection and related pain.  (*Id.*)  Two days later he was in stable condition and discharged with instructions to continue antibiotics.  (R. 546-47.)

Claimant returned to the hospital again on January 17, 2011, citing right thigh pain.  (R. 599.)  His pain was thought to be paresthesia due to neuropathy.  (*Id.*)  A CT suggested acute sigmoid diverticulitis.  (R. 619.)  An EMG was recommended for two weeks after his January 20, 2011 discharge.  (R. 599.)  Claimant, however, returned to the hospital on January 29, 2011, complaining of right groin pain that caused his leg to "give way."  (R. 665.)  He reported that Dilaudid helped with the pain.  (*Id.*)

On February 7, 2011, Claimant presented to LaGrange Hospital with right lower extremity pain and difficulty walking.  (R. 708.)  It was noted that he had a BMI of greater than 40, which is considered obese.  (R. 709.)  He was given Neurotonin and Dilaudid, which improved the pain, and discharged three days later.  (R. 708-09.)

---

[3] Profunda femoris is a deep artery of the thigh. The Free Dictionary, "profunda femoris" http://medical-dictionary.thefreedictionary.com/profunda+femoris, (last visited on February 7, 2017).

Claimant returned to the emergency room on March 28, 2011, complaining of abdominal pain in the right lower quadrant and suprapubic region. (R. 750.) A CT showed a known hernia with some pelvic adipose tissue. (*Id.*) An MRI of the brain and c-spine were recommended, but due to his size it needed to be ordered as an outpatient test. (R. 751.) His complex regional pain syndrome was discussed, but his pain appeared to stabilize and he was discharged the following day. (*Id.*)

Claimant was next admitted to LaGrange Memorial Hospital from April 1, 2011 to April 18, 2011 for rectal bleeding. (R. 778.) He was severely anemic when he arrived in the emergency room due to the blood loss. (*Id.*) He continued to have recurrent red blood per the rectum, and a colonoscopy revealed diverticulitis. (*Id.*) A total abdominal colectomy and ileorectostomy were performed on April 9, 2011. (*Id.*) It was noted that he had "[a]cute renal failure on chronic kidney disease, stage III." (R. 779.) He was cleared for discharge with home healthcare and told to follow up with Dr. Ansari. (*Id.*)

Clinical notes indicate that Claimant was seen on May 19, 2011 with complaints of pain in his right leg and neck.[4] (R. 836.) He was said to be in chronic pain and requested Vicodin. (*Id.*)

On September 7, 2011, Claimant presented at LaGrange Memorial Hospital with complaints of black stool. (R. 906.) He underwent an EGD that revealed a duodenal ulcer, and there was no evidence of bleeding in the stomach. (*Id.*, R. 933.) He was discharged three days later. (R. 906.) Claimant returned to the emergency room with groin pain on September 25, 2011. (R. 850.) He had dysphagia of unclear etiology. (*Id.*) An MRI showed mild to moderate foraminal narrowing, to be managed with pain

---

[4] The signature on the medical record is illegible; however Dr. Ansari is identified as the attending at the top of the document. (R. 836.)

medication.  (R. 851.)  The attending physician documented complex regional pain syndrome ("CRPS") secondary to mild degenerative joint disease of the spine.  (R. 850.)  Claimant was discharged after eight days and told to follow up with Dr. Ansari in one week.  (R. 851.)

Claimant presented to Palos Community Hospital on October 7, 2011 with chest pain and hypertension.  (R. 1013.)  He stated that the pain began when he was driving his cab, and that it felt similar to his heart attack two years prior.  (*Id.*)  Diagnostic findings were all normal.  (*Id.*)

On November 10, 2011, Claimant presented to LaGrange Hospital with left arm pain after falling while walking.  (R. 1116.)  There was no evidence of fracture or dislocation and minimal degenerative changes.  (R. 1117.)  He was given pain medication and discharged the same day.  (R. 1114.)

On December 14, 2011, Claimant returned to LaGrange Hospital with complaints of left arm pain for the past three days.  (R. 1021.)  His test results were normal.  (R. 1017.)  The cardiologist recommended pain treatment for his left arm pain using morphine and cycling serial cardiac biomarkers.  (R. 1022.)

On March 7, 2012, Claimant went to Holy Cross Hospital with complaints of chest pain, and he was transferred to LaGrange Hospital due to his history of treatment there.  (R. 1121.)   A stress test showed reversible ischemic changes, and the physician recommended an angiogram.  (*Id.*)  A cardiac catheterization showed no significant coronary artery disease, and the chest pain was noted to have resolved.  (R. 1122.)  The physician documented that Claimant had chronic pain and prescribed Norco upon discharge two days later.  (*Id.*)

On May 12, 2012, Claimant was taken by ambulance to MacNeal Hospital with complaints of pain and tingling radiating down his left arm. (R. 1041, 1049.) A cardiac catheterization and coronary angiogram showed nonobstructive coronary artery disease. (R. 1043.) His arm pain was thought to be possible early brachial plexus neuralgia, root disease, or a developing zoster rash (shingles.) (R. 1047.)

On June 20, 2012, Claimant presented to LaGrange Memorial Hospital with a two-day history of worsening abdominal pain located over the left lower quadrant and intermittent blood in his stool. (R. 1086.) He was found to have an anal fissure. (R. 1163.) During his stay, he was sent to the ICU when there was a concern of a stroke due to left upper extremity and left lower extremity weakness. (R. 1165.) He was discharged on June 22, 2012. (*Id.*)

On August 7, 2012, Claimant was seen by his primary physician, Dr. Nasreen Ansari. (R. 998, 1196.) Dr. Ansari completed a physical residual functional capacity questionnaire ("RFC"), where she noted that Claimant suffered from neuropathy, coronary artery disease, chronic kidney disease, hypertension, and duodenal ulcers, among other things. (*Id.*) Dr. Ansari characterized Claimant's pain as "daily constant pain in the back/leg/arm." (*Id.*) Dr. Ansari further documented that Claimant's pain would be a constant interference with his ability to be attentive and concentrate on even simple work tasks. (R. 999.) It was also Dr. Ansari's opinion that Claimant was incapable of walking any city blocks without significant pain, and that Claimant would likely be absent more than four days of work per month due to his conditions. (R. 999, 1001.)

On November 14, 2012, Claimant presented to the emergency room at Hinsdale Hospital with intractable back pain. (R. 1197.) The physician noted that Claimant had numerous presentations for this in the past. (*Id.*) The CT was negative, and the diagnosis was musculoskeletal back pain. (R. 1197; 1211.) The physician advised follow up with his primary care physician and exercise. (R. 1197.) He was discharged in stable condition the following day. (*Id.*)

### 2. Agency Consultants

Claimant had an internal medicine consultative examination on October 20, 2011 with Dr. Ewa V. Hampston. (R. 980.) Claimant was 5'10" and 309 pounds, which was a body mass index of 41. (R. 982.) He informed Dr. Hampston that his activities of daily living were extremely restricted, and that he required the help of his family to bathe, dress, and go grocery shopping. (R. 981.) He also reported that he was unable to walk without a walker and could not do any household chores due to pain in his right lower extremity. (*Id.*) Claimant stated that he was not depressed or anxious. (R. 982.) On physical exam, there was generalized tenderness in the lower abdomen in the right and lower quadrants. (R. 983.) There was right lower extremity edema up to the calf as well as right calf tenderness. (*Id.*) He was very sensitive to touch due to severe pain in the right calf, thigh, and groin area. (R. 984.) Claimant declined to bend to do an "extension/flexion" of the spine due to pain. (R. 983.) Dr. Hampston had the following impressions: "1. Right lower extremity pain and weakness secondary to possible hematoma in the right inguinal area in December 2010 with claim of possible nerve damage in that area with history of possible numbness and decreased balance[;] 2.

Most recent abdominal surgery with colon resection secondary to rectal bleeding… 3. Hypertension, coronary artery disease[;] 4. Severe obesity."  (R. 984.)

On November 7, 2011, Dr. Bharati Jhaveri completed a Physical Residual Functional Capacity Assessment.  (R. 986.)  Dr. Jhaveri opined that Claimant could occasionally lift or carry ten pounds and could frequently carry less than ten pounds, but he was limited in his lower extremities to push or pull.  (R. 987.)  Additionally, Dr. Jhaveri marked that Claimant could stand and/or walk for at least two hours in an eight-hour work day, but required a hand-held assistive device due to severe right leg pain.  (*Id.*)  Claimant could sit for about six hours in an eight-hour workday.  (*Id.*)  Claimant could occasionally stoop, kneel, crouch, crawl, or climb stairs, but never climb ladders.  (R. 988.)  Dr. Jhaveri noted no manipulative limitations, visual limitations, communicative limitations, or environmental limitations except that Claimant should avoid concentrated exposure to vibration.  (R. 989-90.)  Dr. Jhaveri documented that Claimant's right lower extremity was tender.  (R. 993.)  Dr. Jhaveri further found Claimant's statements about symptoms to be only partially credible because the statement that the walker was prescribed was not supported by the medical record.  (R. 991.)

On August 30, 2012, Dr. Julian Freeman completed a review of Claimant's medical records in the Social Security file.  (R. 1107.)  Dr. Freeman opined that ischemic heart disease with multiple cardiac catheterizations was evident from October 2009.  (R. 1109.)  Dr. Freeman also determined that "causalgia involving the right femoral nerve, following repair of a femoral artery pseudoaneurysm and subsequent infection, was evident primarily based on symptoms."  (*Id.*)  Lumbar spinal stenosis and

"probable femoral neck impingement" were also evident on CT studies.  (*Id.*)  When

comparing these diagnoses to a listing, Dr. Freeman opined that the most straight-

forward listing is 4.04(b), ischemic heart disease.  (*Id.*)  He reasoned that persistent

manifestations of ischemic heart disease were evident in chest pain and recurrent

congestive heart failure.  (*Id.*)  Additionally, Dr. Freeman opined that Claimant equaled

listing 1.04(c) since December 2010, "by the confirmed presence of spinal stenosis, and

ineffective ambulation [ ], due to a combination of the effect of spinal stenosis, causalgia

involving the femoral nerve (right thigh), and femoral head impingement."  (R. 1110.)

Dr. Freeman determined Claimant had the following functional capacity: one hour of

walking/standing in a day in brief divided periods; sitting for six-to-seven hours a day, for

no more than an hour at a time, and with frequent shifts in position; five pounds of lifting

rarely, but no occasional or frequent, lifting, carrying, pushing, or pulling; occasional use

of left wrist for all activities; and no use of right leg or right foot controls.  (R. 1110.)

### C.  Claimant's Testimony

There were three hearings held before the ALJ related to Claimant's DIB and SSI

claims.  The first hearing was on August 8, 2012 ("the August hearing"), then on

September 21, 2012 ("the September hearing"), and finally on February 8, 2013 ("the

February hearing").  Claimant testified at the August hearing and the February hearing.

(R. 92, 48.)  According to Claimant's attorney, Claimant was in the hospital at the time

of the September hearing.  (R. 86-87.)

At the time of the August hearing Claimant was 47 years old.  (R. 135.)  Claimant

testified that he was separated for 20 years, had no children, and that he lived with his

mother for the last 18-19 years.  (R. 98.)  His mother did the cooking and cleaning.  (*Id.*)

He testified that he stopped working in December 2010 when [the doctor's] "punctured" an artery in his leg during an angiogram, and he was in so much pain that "he couldn't stand it." (R. 97.) He further elaborated that the "puncture" left a hematoma that was eventually removed, and that his leg has been "terrible" ever since then. (*Id.*) Claimant testified that his leg pain limited him and that he could not bend over, crouch, or kneel. (R. 108.) He further stated that he could not sit for long periods of time, about ten to fifteen minutes before needing to shift, and that he needed assistance dressing. (R. 109-110.) When questioned by the medical expert, Claimant agreed that there was nothing wrong with his joints. (R. 113.)

Claimant also testified about the pain in his left arm that had been present for almost a year. (R. 105.) He testified that the pain was getting worse and felt "like needles and pain in my arm." (*Id.*) He testified that this pain limited his ability to lift or grab items. (*Id.*)

Claimant testified that he quit smoking two months ago, he did not drink, and he did not use street drugs. (R. 99.) He explained that he took Vicodin and Tylenol to deal with the "sharp" pain in his leg, but that it only helped a little. (R. 106-07.) When pressed by the ALJ about prescription drugs, Claimant stated that he had issues with pain pills because they were not relieving the pain. (R. 99-100.)

Claimant arrived at the hearing with a walker and testified that he had been using the walker since it was given to him at LaGrange Hospital in December of 2010. (R. 101.) He testified that he used the walker when he had to walk long distances; for shorter distances he would use a cane. (R. 102.) Claimant's attorney noted that there

was no prescription for the walker from the hospital, but Claimant testified that Dr. Yamayachi prescribed it.  (R. 104, 108.)

At the February supplemental hearing, Claimant was questioned about his recent work history.  (R. 54.)  Claimant testified that he worked for a cab company for six weeks.  (*Id.*; R. 58.)  He testified that during one of his driving shifts he went to the hospital for pain in his chest, and that the cab company "was too scared" to continue his employment because he was deemed a high risk.  (R. 54-55.)  When questioned by his attorney about his recent work experience, Claimant stated that his diverticulosis caused him to use the restroom frequently during work.  (R. 58.)  Claimant also testified that when he drove pain would shoot down his left arm and into his leg.  (R. 60.)  He described the pain as sharp and an eight out of ten.  (*Id.*)  The pain would last 15-20 minutes, and he would have to get out of the cab and walk around to relieve the pain.  (R. 60-61.)

The ALJ asked additional questions about Claimant's current health, including current medications, current smoking habits, and drinking habits.  (R. 53-54, 56.)  Claimant had taken six different kinds of medication the morning of his testimony.  (R. 56.)  He stated that he had taken up smoking again recently, but that he had not had a drink for many years.  (R. 53.)

### D.  Medical Experts' Testimony

At the August and September hearings, Dr. James McKenna testified as an impartial medical expert.  (R. 114, 85.)   At the February hearing, Dr. Sheldon Slodki testified as an impartial medical expert.  (R. 49.)

Dr. McKenna testified at the August hearing that Claimant was morbidly obese with a BMI of 44.  (R. 114.)  Dr. McKenna stated that Claimant had a history of coronary heart disease that was stented around October 2009, and that the stent was patent, or "doing what it was supposed to do."  (R. 114-15.)  Dr. McKenna testified about the December 2010 hospitalization and stated that Claimant had a "significant aneurism." (R. 115.)  Dr. McKenna was surprised that physicians have not repaired the aneurism, but he did note that the hematoma was removed and that aneurisms are generally a painless phenomenon.  (*Id.*)  When discussing Claimant's right leg pain and potential sciatica, Dr. McKenna admitted that "it's actually very confusing."  (R. 116.)  He explained that the right leg pain is of unclear etiology and that they do not know where it is coming from or whether it is of the appropriate magnitude.  (*Id.*)  When asked by the ALJ about the Claimant's pain, Dr. McKenna stated that he did not have any reports of an EMG that would provide information about the location of the pain.  (R. 103-04.) Claimant then explained that he did not have insurance for an EMG at the time of his treatment.  (R. 104.)

Dr. McKenna spoke extensively about Claimant's diagnosis of complex regional pain syndrome.  (R. 116.)  Dr. McKenna opined that the medical record did not have the prerequisites for CRPS.  (R. 116-17.)  Although a diagnosis of CRPS "would explain a lot of things, which are otherwise unexplained," Dr. McKenna testified that it could not be established based on the medical file.  (*Id.*)  Further, Dr. McKenna did not have any imaging of the left arm or right leg to address the pain in those extremities.  (R. 118.)

Dr. McKenna also discussed Claimant's diverticulosis and the April 2011 colectomy.  (R. 118.)  He testified that Claimant's symptoms of weight loss, diarrhea

and bleeding were expected with the procedure and that there might be issues with lifting due to tearing. (R. 121-22.) Additionally, Dr. McKenna testified that Claimant's renal insufficiency was at a level of concern, but only slightly above normal. (R. 122.)

Finally, Dr. McKenna testified that he did not believe any of the impairments or group of impairments met or equaled a listing. (R. 123.) The ALJ then requested Dr. McKenna's opinion on Claimant's functional limitations. (R. 125.) Dr. McKenna opined that Claimant would be limited to sedentary level of activities. (R. 126.) He added, however, that if Claimant had "bona fide" Reflex Sympathetic Dystrophy he would "not be able to tolerate walking a block." (*Id.*) He continued his opinion by stating that Claimant was not walker dependent as of yet because he also used a cane. (*Id.*) When asked by the ALJ if he was giving a less than sedentary RFC, Dr. McKenna testified "[w]ell, I'm not quite sure." (R. 127.)

During the September hearing, Dr. McKenna amended his previous testimony. (R. 88.) He testified that Claimant did meet listing 4.04(b) at one point because he had frequent admissions for cardiac catheterizations. (R. 88.) However, because he has only had one cardiac catheterization since October 2011, he did not continue to meet the listing. (R. 88.) Dr. McKenna also stated that Claimant did not meet any specific bowel listing. (R. 89.) Contrary to his August testimony, Dr. McKenna concluded by stating that he recommended a light RFC. (R. 89.)

At the February hearing, Dr. Sheldon Slodki testified as the medical expert. (R. 61.) Dr. Slodki evaluated Claimant's medical record against several listings, including 4.04, coronary heart disease; 11.14, neuropathy; 2.10, hearing loss; 9.00, diabetes

mellitus; 6.02, chronic kidney disease; 1.04 c-spine. (R. 62.) He stated that Claimant did not meet any listing. (R. 66-67.)

Dr. Slodki spoke extensively about Claimant's cardiac history and explained that Claimant did not meet listing 4.04 because the most recent cardiac catheterizations showed minimal coronary artery disease. (R. 65-66.) Further, Dr. Slodki opined that Claimant's frequent bowel movements and "dumping syndrome" were common among people after a colectomy. (R. 67.) Additional questioning by Claimant's attorney led to further explanation of listing 4.04. (R. 71.) Dr. Slodki explained that although Claimant had enough cardiac catheterizations to meet part (b) of the listing, these tests did not show surgical lesions that would meet part (c) of the 4.04 listing. (R. 71-72.)

Dr. Slodki also opined on Claimant's RFC. (R. 68.) He stated that he did not disagree with Dr. Ansari's RFC assessment, which was sedentary with postural and environmental accommodations. (*Id.*) When questioned by Claimant's attorney, Dr. Slodki testified that Claimant's CRPS diagnosis came down to credibility because pain is involved. (R. 69-70.)

## E. Vocational Experts' Testimony

At the August hearing, Steven Sprower testified as an impartial vocational expert ("VE"). The ALJ asked Mr. Sprower to classify Claimant's past work as a forklift operator. (R. 128.) Mr. Sprower classified Claimant's past relevant work as an industrial truck operator, which was medium, semi-skilled work, and "heavy" based on Claimant's description. (*Id.*) The VE testified that Claimant could not perform this past relevant work if he were limited to sedentary work. (*Id.*)

Next, the ALJ asked the VE to assume the following hypothetical person: an individual of Claimant's age, education, and work experience who could (1) occasionally climb ramps and stairs, but never ladders, ropes or scaffolds, (2) occasionally balance, stoop, kneel, crouch, crawl, and (3) tolerate occasional exposure to vibration and hazards, such as moving machinery or unprotected heights. (R. 129.) When asked whether there would be jobs for such an individual, the VE testified that such a person would be capable of performing work as a Food and Beverage Order Clerk (5,900 jobs in Illinois), Bench Hand Assembler (20,000 jobs in Illinois), and Charge Account Clerk (2,400 jobs in Illinois). (*Id.*)

The ALJ then asked whether a need to stand up and walk for up to two total hours during an eight-hour work day, but only in ten to fifteen minute increments, would affect the hypothetical person's ability to perform the jobs identified. (R. 129-30.) The VE testified that they would not. (R. 130.) He added later that being away from the job more than ten percent of the work day would be considered employment prohibitive. (R. 131.)

When asked by Claimant's attorney whether missing more than one day per month would be work preclusive, the VE stated it would be because six to eight days a year is the maximum. (*Id.*) Claimant's attorney then clarified Claimant's need to stand and move throughout the day, and the VE testified that he would not be able to work if he was not focusing on his job for five minutes each time he needed to move. (R. 132.)

At the February hearing, Glee Ann Kehr testified as an impartial vocational expert ("VE Kehr"). (R. 74.) The ALJ asked VE Kehr about Claimant's past relevant work. (R. 75.) She stated that prior relevant work was as a forklift operator that was classified as

medium, low end semi-skilled, and not transferrable below the medium level. (R. 75.)
The ALJ then asked VE Kehr to consider a hypothetical person of Claimant's age,
education, and work experience, who could perform sedentary work and could (1)
occasionally climb ramps and stairs but never ladders, ropes, or scaffolds; (2)
occasionally balance, stoop, kneel, crouch, and crawl; and (3) tolerate occasional
exposure to vibration and hazards such as moving machinery or unprotected heights.
(R. 76.) The ALJ asked VE Kehr whether there would be jobs for this type of individual.
(*Id.*) VE Kehr testified that such a person would be capable of performing work in the
following sedentary, unskilled positions: address clerk (2,900 positions in Chicago
metropolitan area), account clerk (3,300 positions in Chicago metropolitan area), and an
order clerk (7,500 positions in Chicago metropolitan area). (R. 76.)

The ALJ posed another hypothetical person of the Claimant's same age,
education and work experience who could perform sedentary work and could (1)
occasionally climb ramps and stairs, but never ladders, ropes or scaffolds; (2)
occasionally balance and stoop, but never kneel, crouch or crawl; (3) tolerate
occasional exposure to extreme cold and heat, wetness, humidity, and vibration, but not
work around hazards such as moving machinery or unprotected heights; and (4)
tolerate and/or function in an environment with office level noises. (R. 77.) Again, the
ALJ asked if there would be jobs for this type of individual. (*Id.*) VE Kehr testified that
such a person would still be able to perform the same positions she previously
identified. (*Id.*) The ALJ then asked whether a need to change position from sitting to
standing on an hourly basis would affect an individual's ability to do these jobs. (*Id.*)

VE Kehr testified that the three jobs could be performed sitting or standing with the caveat that they remain on-task as much as 85 percent of the work time. (*Id.*)

The ALJ asked about break times and time off, specifically whether bathroom breaks were included with regularly scheduled breaks. (R. 78.) VE Kehr testified that generally after two-hour increments there is a fifteen-minute break and one thirty-minute break offered for lunch, and that the fifteen percent of allowable off task time (which includes bathroom breaks) is above and beyond that break time. (R. 78.) Additionally, she testified that an individual can miss no more than one day per month. (R. 79.)

When questioned by Claimant's attorney, VE Kehr testified that if the bathroom breaks exceeded the off-task time, then they would not be allowed. (R. 80.) She further testified that the inability to hear out of one ear would have minimal vocational impact on the identified positions. (R. 81.) VE Kehr also testified that use of an assistive device, such as a cane would be allowable in all three identified positions. (R. 82.)

## II.    LEGAL ANALYSIS

### A.  Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). We must consider the entire administrative record, but will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d

535, 539 (7th Cir. 2003) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).  This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (quoting *Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," she "must build an accurate and logical bridge from the evidence to [her] conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate [her] assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287(7th Cir. 1985)).

## B.  Analysis under the Social Security Act

In order to qualify for disability insurance benefits or supplemental security income, a claimant must be "disabled" under the SSA.  A person is disabled under the SSA if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  The claimant has the burden

of establishing a disability at steps one through four. *Zurawski*, 245 F.3d at 885–86. If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ followed this five-step analysis. At step one, the ALJ found that Claimant had worked since the alleged disability onset date of December 21, 2010, but that this work did not rise to the level of substantial gainful activity. (R. 24.) At step two, the ALJ found that Claimant had the following severe impairments: coronary artery disease with stent placement; hypertension; diabetes mellitus; peripheral neuropathy; chronic regional pain syndrome[5]; degenerative disc disease of the lumbar spine; chronic kidney disease; irritable bowel syndrome/diverticulitis; status post colectomy; and morbid obesity. (R. 25.) At step three, the ALJ found that the Claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

Before step four, the ALJ found that Claimant had the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.927(a), except that Claimant could occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds; could occasionally balance and stoop, but never kneel, crouch and crawl; could tolerate occasional exposure to extreme cold and heat, wetness, humidity, and vibration; could not work around hazards such as moving machinery or unprotected heights; and he could tolerate and function in work environments with office level noise. (R. 25-26.) At step four, the ALJ also found that Claimant is unable to perform past relevant work. (R. 31.) However, at step five, the ALJ found that Claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national

[5] Also referenced as complex regional pain syndrome.

economy.  (R. 32-33.)  As a result, the ALJ found that Claimant has not been under a disability from December 21, 2010 though the date of her decision.  (R. 33.)  The Appeals council denied the request for review on August 18, 2014, leaving the ALJ's decision as the final decision of the Commissioner and, thus, reviewable by the District Court under 42 U.S.C. § 405(g).  (R. 1-3.)

Claimant now argues that the ALJ's finding that Claimant suffered from chronic regional pain syndrome was inconsistent with the ALJ's finding that the severity of Claimant's symptoms was not credible.  Claimant also argues that the ALJ erred in failing to analyze how Claimant's loose stools with frequent bathroom use and left arm pain would affect his residual functional capacity.  Additionally, Claimant argues that the ALJ failed to rely on the appropriate treating physician and did not explain fully why she accepted and rejected various medical opinions.  Finally, Claimant argues that the ALJ failed to analyze whether Claimant's impairments equaled listing 1.04(c).

## C.  The ALJ properly analyzed whether Claimant's impairments equaled listing 1.04(c).

At step three, the ALJ determined whether Claimant met or medically equaled the severity of one of the listings.  Claimant bears the burden of proving that his impairments satisfied the criteria of the listing.  *Ribaudo v. Barnhart,* 458 F.3d 580, 583 (7th Cir. 2006).  To meet or equal a listed impairment, the claimant must satisfy all the criteria of the listed impairment.  *Maggard v. Apfel,* 167 F.3d 376, 379-80 (7th Cir. 1999).  Additionally, the satisfaction of these criteria must be supported by a medical expert's opinion.  *Barnett v. Barnhart,* 381 F.3d 664, 670 (7th Cir. 2004). It is, however, necessary for the ALJ to do more than just mention the specific listings she is considering.  *Maggard,* 167 F.3d  at 379-80.

In this case, the ALJ noted that she considered listings 4.04, 1.04, 11.14, 2.10 and the factors outlined for consideration when evaluating diabetes mellitus.  (R. 25.) Listing 1.04(c) is related to disorders of the spine.  The Claimant relies heavily on the opinion of Dr. Freeman to support his conclusion that he meets listing 1.04.  (R. 25.) The ALJ provided sufficient explanation as to why she afforded little weight to Dr. Freeman's opinion.  Specifically, she explained that the opinion was not one of a treating physician and focused on evidence that was not in the record and based on Claimant's subjective complaints.  (R. 31.)  Additionally, it should be noted that in Dr. Freeman's opinion, he was careful to add that there was no precise medical record to support listing 1.04.  (R. 1110.)  For these reasons, the Court finds that the ALJ properly analyzed whether Claimant's impairments equaled listing 1.04(c).

**D.  The ALJ's finding that Claimant suffered from chronic regional pain syndrome was inconsistent with the ALJ's finding that the severity of Claimant's symptoms was not credible.**

Claimant's diagnosis of chronic regional pain syndrome is supported by the record through Claimant's testimony and physician records, which indicate that Claimant's pain was recurring and that he was treated numerous times with pain medication.  (R. 353, 448, 864, 912.)  SSR 03-02p addresses CRPS in detail, describing it as "complaints of intense pain and findings indicative of autonomic function at the site of the precipitating trauma."  SSR 03-02p.  CPRS is a medically determinable impairment when it is documented by appropriate medical signs, symptoms, and laboratory findings.  *Id.*  "For the purposes of Social Security disability evaluation, [ ] CRPS can be established in the presence of persistent complaints of pain that are typically out of proportion to the severity of any documented precipitant and one or more

of the following clinically documented signs[…]: swelling, autonomic instability, abnormal hair growth, osteoporosis or involuntary movements in the region." *Id.*

The ALJ found that Claimant had the severe impairment of CRPS. (R. 25.) Dr. Slodki testified at the February hearing that CRPS is "a pain situation and whenever there's pain concerned it's a credibility issue…. [s]o, the judge is going to have to evaluate the credibility." (R. 70.) Therefore, by determining that Claimant suffered from the severe impairment of CRPS, the ALJ accorded credibility to Claimant's pain complaints. The ALJ, however, subsequently noted that she found that Claimant's statements regarding the "intensity, persistence and limiting effects of these symptoms [we]re not entirely credible[.]" (R. 27.)

Since the ALJ issued her decision in this case, the SSA has issued new guidance on how the agency assesses the effects of a claimant's alleged symptoms. SSR 96-7p and its focus on "credibility" has been superseded by SSR 16-3p in order to "clarify that subjective symptom evaluation is not an examination of the individual's character." *See* SSR 16-3p, 2016 WL 1119029, at *1 (effective March 16, 2016). As SSR 16-3p is simply a clarification of the Administration's interpretation of the existing law, rather than a change to it, it can be applied to Claimant's case. *See Qualls v. Colvin*, No. 14 CV 2526, 2016 WL 1392320, at *6 (N.D. Ill. Apr. 8, 2016); *Hagberg v. Colvin*, No. 14 CV 887, 2016 WL 1660493, at *6 (N.D. Ill. Apr. 27, 2016). While the Court will rely on the new guidelines under SSR 16-3, the Court is also bound by case law concerning former SSR 96-7p. *Farrar v.* Colvin, No. 14 CV 6319, 2016 WL 3538827, at *5 (N.D. Ill. June 29, 2016).

Under SSR 16-3, the ALJ must first determine whether the Claimant has a medically determinable impairment that could reasonably be expected to produce his symptoms.  SSR 16-3p, 2016 WL 1119029, at *2.  Then, the ALJ must evaluate the "intensity, persistence and functionally limiting effects of the individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities."  *Id.*  An individual's statements about the intensity and persistence of the pain may not be disregarded because they are not substantiated by objective medical evidence.  *Id.* at *5.  In determining the ability of the Claimant to perform work-related activities, the ALJ must consider the entire case record, and the decision must contain specific reasons for the finding.  *Id.* at *4, 9.

Here, the ALJ found that Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the ALJ then stated that Claimant's statements concerning intensity, persistence and limiting effects were not entirely credible under SSR 96-7.  (R. 27.)   The ALJ pointed to the fact that Claimant did not stop working because of his impairments, rather, he was laid off.  (R. 30.)  Additionally, the ALJ stated that Claimant was inconsistent in his testimony about drugs and alcohol, noncompliant with his medication, and continued to smoke cigarettes after being instructed to stop.  (*Id.*)  These facts were weighed in the ALJ's decision on credibility.

Since the ALJ did find that Claimant suffered from CRPS, there is merit to Claimant's argument that the ALJ's findings are inconsistent.  The ALJ must resist the temptation to play doctor and adhere to the opinions of medical professionals for the implications of a condition.  *Schmidt v Sullivan,* 914 F.2d 117, 118 (7th Cir. 1990).  She

may not rely upon her own inferences about medical findings. *Blakes ex rel. Wolfe v. Barnhart,* 331 F.3d 565, 570 (7th Cir 2003). Here, the ALJ had no medical evidence to support the assertion that Claimant had returned to full strength to perform his duties as a cab driver. Further, the ALJ ignored the Claimant's testimony that he was laid off because his company thought that his impairments made him a high risk employee. (R. at 54-55.) Additionally, the Seventh Circuit has routinely held that the fact that someone works is not sufficient ground for concluding that someone is not disabled. *Goins v. Colvin*, 764 F.3d 677, 678 (7th. Cir. 2014) (citing *Shauger v. Astrue,* 675 F.3d 690, 697 (7th Cir. 2012)).

Accordingly, based on the foregoing, the Court finds that the ALJ's finding that Claimant suffered from CRPS was inconsistent with her finding on credibility. On remand the ALJ should conduct a symptom evaluation pursuant to the new SSR 16-3p.

**E. The ALJ did not properly evaluate Claimant's subjective symptoms related to irritable bowel syndrome and diverticulitis.**

The ALJ is not required to discuss every piece of evidence, but is instead required to build a logical bridge from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2011). An ALJ., however, "has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 426 (7th Cir. 2010). Here, the ALJ found that Claimant had the RFC to perform sedentary work, with additional limitations. (R. 29.) She stated that in forming her opinion she considered all symptoms and the extent to which these symptoms could reasonably be accepted as consistent with medical evidence. (R. 26.)

Claimant's medical history included notes about the Claimant's history of

gastrointestinal issues. (R. 29.) Dr. McKenna and Dr. Slodki also both discussed the implications of Claimant's gastrointestinal issues. (R. 67, 118-22.) At step two of her review, the ALJ determined that Claimant suffered from the severe impairments of irritable bowel syndrome and diverticulitis, among others. (R. 25.) Claimant argues that it is inconsistent for the ALJ to find that a condition is severe, yet not address it in relation to functional limitations. The ALJ noted that Claimant has suffered from diverticulitis and irritable bowel syndrome long-term, but also observed that he was able to work as a cab driver with the condition.[6] (R. 29.) Claimant testified that the frequent bathroom visits affected his ability to work, and Dr. McKenna confirmed that one could expect such symptoms after Claimant's colectomy. (R. 58-59, 120-21.)

It is necessary for the ALJ to more completely consider how Claimant's irritable bowel syndrome and diverticulitis will affect work related activities. Specifically, the ALJ did not consider whether Claimant's constant need for bathroom breaks would create an unacceptable off-task time for sustainable employment. While an ALJ need not give weight to every piece of evidence in the record, "he must confront the evidence that does not support his conclusion and explain why it was rejected." *Farrar,* 2016 WL 3538827, at *7 (quoting *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). Specifically, the ALJ must address why she did not include limitations related to Claimant's recent bowel surgery. Stating that Claimant has suffered from diverticulitis long term does not sufficiently explain the rejection of limitations related to the surgery. As such this case should be remanded for further review of the symptoms.

---

[6] The ALJ, however, did not find Claimant's six weeks as a cab driver to constitute substantial gainful activity. (R. 24.)

## F. The ALJ did not properly explain why she rejected Dr. Ansari's medical opinions.

Next, Claimant argues that the ALJ failed to explain fully why she accepted and rejected various medical opinions. "A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). An ALJ may discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician, or when the treating physician's opinion is internally inconsistent, as long as she "minimally articulates [her] reasons for crediting or rejecting evidence of disability." (*Id.*)

In this case, Dr. Ansari is identified as Claimant's primary care physician (R. 457, 548); however, there are no medical records from Dr. Ansari other than her RFC opinion in the record. [7] The ALJ explained that she afforded little weight to Dr. Ansari because her opinion was "based upon the claimant's subjective complaints and thus the functional limits appear to be a sympathetic opinion." (R. 31.) Claimant argues that this is an improper discrediting of the treating physician. The ALJ also stated that Dr. Ansari's opinion was inconsistent with the physician's own objective clinical or laboratory findings. (*Id.*) The ALJ, however, did not provide any specific examples of these inconsistencies nor did she address the lack of medical records from Dr. Ansari with Claimant or ask for more information regarding the treatment rendered by the primary care physician. Accordingly, given the ALJ's failure to identify any inconsistencies within Dr. Ansari's own findings, the Court finds that the ALJ's explanation fails to meet the minimum requirement articulated in *Skarbek*. On remand,

[7] Two records may be from Dr. Ansari, but there is no clear signature to identify the treating physician. (R. 836, 1196.)

the ALJ shall provide a more thorough assessment and discussion of Dr. Ansari's treatment and medical opinions and inquire whether there are any additional medical records from Dr. Ansari that were not included within this present record.

In light of this decision to remand, the ALJ is expected to reassess all medical opinions following her thorough assessment of Dr. Ansari's opinions. Therefore, we need not address Claimant's argument that the ALJ failed to explain why she accepted or rejected the remaining medical opinions.

### III.   CONCLUSION

For the aforementioned reasons, Claimant's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this opinion. It is so ordered.

**ENTERED:**

_____

**Michael T. Mason**
**United States Magistrate Judge**

**Dated: February 16, 2017**